Danna **MARRIOTT,** James Mathieson, James Slowey, and Paul McGourty, Plaintiffs,

v.

**SEDCO FOREX INTERNATIONAL RESOURCES, LIMITED,** Defendant.

**Civ. A. Nos. 89–2689–Y, 89–2690–Y.**

United States District Court, D. Massachusetts.

July 22, 1993.

Susan F. Drogin, William F. Looney, Jr., Bertram E. Snyder, Looney & Grossman, Boston, MA, for plaintiffs.

Richard H. Pettingell, Morrison, Mahoney & Miller, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

In this consolidated action, an American seaman and three foreign seamen seek to recover damages under American law from their employer, a British Virgin Islands corporation, for emotional distress they allegedly suffered after finding they had been inoculated with a vaccine testing positive for the Human Immunodeficiency Virus (HIV), the virus which causes the Acquired Immune Deficiency Syndrome (AIDS). The seamen were inoculated with the contaminated vaccine while working for their employer aboard an oil rig located off the coast of India. The seamen have tested HIV-negative to date, but seek to recover for the severe anxiety and trauma they allegedly suffered as a result of their fear of having contracted HIV and thus AIDS.

The plaintiffs assert Jones Act negligence claims, unseaworthiness claims under the general maritime law, and also related punitive damages claims. The defendant employer has moved for summary judgment on several grounds, first suggesting that neither United States law nor a United States forum is appropriate here, and on the basis that the plaintiffs fail to state a claim under the Jones Act and the general maritime law arising from the fear of contracting AIDS. The case

presents novel and interesting issues regarding the accessibility of American maritime law and an American forum to American and foreign seamen stationed overseas, and challenges the boundaries of allowable recovery under maritime law for emotional distress without attendant physical injury.

## I. FACTUAL BACKGROUND [1]

### A. THE PLAYERS

The plaintiff Paul J. McGourty ("McGourty," or the "American seaman") is a citizen and permanent resident of the United States residing in Braintree, Massachusetts. The plaintiffs Danna Marriott ("Marriott") and James Slowey ("Slowey") are citizens of the United Kingdom born in England, with residence in South Africa. James Mathieson ("Mathieson," and collectively with Marriott and Slowey, the "foreign seamen") is a citizen of the United Kingdom born in Scotland, also with residence in South Africa.

The defendant Sedco Forex International Resources, Limited ("Sedco"), the plaintiffs' employer, is a corporation organized and existing under the laws of the British Virgin Islands. Sedco is a wholly owned subsidiary of Sedco Forex International, Inc. ("Sedco International"), a corporation organized and existing under the laws of Panama. Neither Sedco nor Sedco International has offices in or performs work in the United States. Sedco International is a wholly owned subsidiary of Schlumberger Limited ("Schlumberger"), a publicly traded corporation organized and existing under the laws of the Netherland Antilles with principal offices in New York and Paris. At no material time did Sedco,

Sedco International, or Schlumberger have any officers or directors in common.

Schlumberger owns several hundred subsidiaries throughout the world involved in a variety of businesses. Sedco and Sedco International are among Schlumberger's "Sedco Forex" group of subsidiaries, a group of companies involved in the oil and gas drilling business.[2] The Sedco Forex group engages in operations all over the world, including in and around the United States, but these operations are concentrated, if anywhere, in the Southern Asia and Middle East territorial and oceanic regions. (See Map, Stip. Ex. 30 at 26–27.) Schlumberger provides numerous centralized services to the Sedco Forex companies, including informational publications, and pension, profit sharing, and stock purchase plans. Many of these benefit plans and publications are administered and published in the United States, and Sedco subscribed to, and the plaintiffs belonged to, several of these benefits plans.[3]

Prior to 1984, the plaintiffs worked for Sedco, Inc., an independent Texas corporation involved in the oil and gas drilling business. On or about December 24, 1984, Sedco, Inc. was purchased by Schlumberger Technology Corporation ("Schlumberger Technology"), a Schlumberger subsidiary organized and existing under the laws of Texas. From January 1, 1985 to December 31, 1985, the plaintiffs were employed by Schlumberger Technology.[4] After January 1, 1986 and during all relevant events, the plaintiffs were employed by Sedco.

---

1. The parties have agreed to a stipulated set of facts for the purposes of the present motion, but have reserved their rights to contest these facts at trial.

2. The Sedco Forex group name is used, for example, in Schlumberger's Annual Reports to its stockholders, and in its 10–K and 10–Q forms filed in accordance with the Securities Acts of 1933 and 1934.

3. The plaintiffs belonged to different numbers of these plans, and McGourty, as a United States citizen, had more of his benefits plans administered in the United States than did the foreign seamen. Under the Sedco Forex International Staff Medical Plan, for example, United States citizens were required to submit any claims under the plan to Connecticut General Life Insur-

ance Company in Sherman, Texas, while non-United States citizens were required to submit claims under the plan to a claims agent in England.

4. From January 1, 1985 (after buying out Sedco, Inc.) to July 1988, Schlumberger Technology maintained a division based in Dallas, Texas whose purpose, among other things, was to provide support services to the Sedco Forex group of companies. Subsequently, these services were taken over by Services Techniques Sedco Forex, S.A. ("Techniques"), another Schlumberger subsidiary organized and existing in France. Techniques has no offices in and performs no work in the United States.

Hitech Drilling Services Indian Private, Limited. ("Hitech") is a publicly traded corporation organized and existing under the laws of India engaged in the exploration and production of petroleum, gas, water, and other substances in and around India. Hitech's offices and operations are in India, and it performs no work in the United States. At all relevant times, thirty six percent (36%) of Hitech's stock was owned by Sedco Forex International Drilling ("Sedco Drilling"),[5] a Schlumberger subsidiary organized and existing under the laws of Panama which also has no offices in and conducts no business in the United States. The remaining sixty four percent (64%) of Hitech's stock was at all relevant times owned by members of the Indian public or by Indian corporations.

## B. THE OVERSEAS EVENTS

On March 30, 1987, Sedco entered into an agreement with Hitech under which Sedco agreed to provide Hitech with technical personnel for use in Hitech's exploration of India's land and continental shelf for the presence of petroleum and gas products. Pursuant to this agreement, Sedco assigned all four plaintiffs to work aboard Hitech's drill rig TAHARA, a vessel owned by Hitech and maintained under Liberian registry.[6] The relevant employment contracts signed between the plaintiffs and Sedco for the TAHARA expedition are dated July 1, 1987. Sedco signed these contracts in London, England, but it is not clear when and where the plaintiffs signed them. There is no evidence that the plaintiffs signed these contracts in the United States. At all material times while aboard the TAHARA, the plaintiffs were under the direct supervision of Sedco personnel with respect to the day to day operations of the TAHARA, but the overall management of the TAHARA, including when and where the TAHARA was to conduct its operations, remained with Hitech.

On January 5, 1989, while the TAHARA was engaged in operations above India's continental shelf, Dr. Jagdale, an Indian national employed by Hitech, discovered that one of the TAHARA's catering staff had developed hepatitis. Dr. Jagdale recommended that all crew members, including the plaintiffs, be inoculated against the Hepatitis virus. In response to this recommendation, fifty-five (55) vials of Globunal immunaglobulin ("Globunal"), manufactured in India in 1988, and fifty-five (55) syringes, were delivered to the TAHARA. At or about this time, Dr. Jagdale's tour of duty on the TAHARA ended, and he was replaced by Dr. M.H. Baig, also an Indian national employed by Hitech. On or about January 14, 1989, all members of the crew then onboard the TAHARA, including the plaintiffs, received Globunal injections, inoculating them against Hepatitis. One vial of Globunal, the fifty-fifth, remained.

On March 6, 1989, *The Times of India* published an article reporting that 30 percent of blood products manufactured in India in 1988 were contaminated with the HIV, the virus which causes AIDS. On March 12, 1989, copies of that issue of *The Times of India* were distributed onboard the TAHARA. In response to concerns of the crew members, on March 17, 1989, the fifty-fifth remaining vial of Globunal was transported to the Indian Council of Medical Research's Institute of Immunohematology in Bombay for testing.[7] The vial was found to be positive for the presence of HIV antibodies on the *ELISA* test, a well-known and commonly-used test for detecting HIV. Sometime after March 18, 1989, the plaintiffs were informed that the results of the *ELISA* test had been positive.

To date, none of the plaintiffs have tested positive for the HIV, but all have suffered severe emotional distress due to their fear of

5. Sedco Drilling is presumably a member of Schlumberger's Sedco Forex group of companies.

6. Hitech purchased the TAHARA on September 22, 1988 from Cortez Limited, a British Virgin Islands corporation in which neither Schlumberger nor any of its subsidiaries had an ownership interest. Cortez Limited had purchased the TAHARA on May 3, 1988 from Triton Industries,

Inc., a corporation existing under the laws of Panama and a wholly owned subsidiary of Schlumberger.

7. At the time of this incident, the hepatitis vaccine used on the crew was comprised of human blood products. Today in the United States the vaccine is completely synthetic.

having contracted HIV and AIDS. None of the plaintiffs have as yet sought a remedy in any other jurisdiction.

On November 22, 1989, the American seaman (McGourty) and the three foreign seamen (Marriott, Mathieson, and Slowey) filed two separate actions in this Court, both complaints naming as defendants Schlumberger and Sedco International. On February 19, 1991, the two cases were consolidated. On September 25, 1992, all four plaintiffs filed a Second Amended Complaint (the "Complaint"), substituting Sedco as defendant for Schlumberger and Sedco International. Pursuant to a contemporaneous joint stipulation, Sedco agreed to consent to personal jurisdiction in the District of Massachusetts. The plaintiffs' Complaint asserts negligence claims under the Jones Act, unseaworthiness claims under the general maritime law, and also related punitive damages claims. The defendant Sedco here moves for summary judgment.

## II. ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted only when the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the burden of demonstrating its legal entitlement to summary judgment, *Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1516 (1st Cir.1991), and a court must view the record in the light most favorable to the non-moving party. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Nonetheless, the non-movant cannot content himself with unsupported allegations; rather, he must set forth specific facts, in suitable evidentiary form, in order to establish the existence of a genuine

issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). It is against this backdrop that the Court examines Sedco's motion for summary judgment.

### B. CHOICE OF LAW

█ Defendant first seeks to dismiss the plaintiffs' claims on the basis that American law does not apply.

█ The Supreme Court has identified eight factors which determine whether federal maritime law applies to a maritime tort:

(1) the place of the wrongful act; (2) the law of the flag of the vessel involved; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of a foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations.

*Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308, 90 S.Ct. 1731, 1733, 26 L.Ed.2d 252 (1970); *Lauritzen v. Larsen*, 345 U.S. 571, 577, 73 S.Ct. 921, 925–26, 97 L.Ed. 1254 (1953); *Kukias v. Chandris Lines, Inc.*, 839 F.2d 860, 862 (1st Cir.1988). The test is not a mechanical one, but must be viewed in light of the totality of circumstances in order to effectuate the liberal purposes of the Jones Act. *Rhoditis*, 398 U.S. at 309–310, 90 S.Ct. at 1734–35. Moreover, the significance of each factor in a nontraditional maritime context like offshore oil drilling varies from that in the traditional shipping context in which the *Lauritzen–Rhoditis* test arose. *Fogleman v. ARAMCO*, 920 F.2d 278, 282 (5th Cir.1991); *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1482 (9th Cir.1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988), *amended on other grounds*, 861 F.2d 565 (1988); *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82, 88 (9th Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).[8] The Court fleshes out

---

8. The plaintiffs do not contest Sedco's treatment of the TAHARA as a "drilling rig." Nevertheless, it is appropriate to point out that the drilling rig analysis applies not only to permanently situated rigs, but also to vessels which can move under

their own power or which do not remain in a single fixed location, as long as the movements are limited to a particular region. *Zipfel*, 832 F.2d at 1483; *Koke v. Phillips Petroleum Co.*, 730 F.2d 211, 219 (5th Cir.1984), *overruled on other*

these drilling rig distinctions during its analysis.

### 1) *Place of the Wrongful Act*

■ Generally accorded little weight in traditional maritime cases since the locality of the ship changes constantly, *Lauritzen,* 345 U.S. at 583–84, 73 S.Ct. at 928–29, the place of the wrongful act assumes great importance in the drilling rig context. *Fogleman,* 920 F.2d at 282; *Zipfel,* 832 F.2d at 1482. Moreover, the contaminated vaccine was produced, distributed, and administered in and around India.

### 2) *Law of the Flag*

■ Usually of "cardinal importance" in determining choice of law in traditional maritime cases, *Kukias,* 839 F.2d at 862, the law of the flag generally is of lesser importance in the drilling rig context. *Fogleman,* 920 F.2d at 282; *Zipfel,* 832 F.2d at 1482. Here, the TAHARA sailed under the Liberian flag.

### 3) *Allegiance or Domicile of the Injured*

■ Generally considered a "significant factor" in traditional maritime cases, *Kukias,* 839 F.2d at 862, the allegiance or domicile of an injured seaman is of even greater importance in the drilling rig context. *Zipfel,* 832 F.2d at 1482. Here, McGourty is a citizen and resident of the United States, and the foreign seamen reside in South Africa and are citizens of England (Marriott, Slowey) and Scotland (Mathieson).

### 4) *Allegiance of the Shipowner*

■ Where the plaintiff's employer is not the shipowner, but rather an entity hired to operate the vessel, a court must consider the allegiance of the plaintiff's employer as well as the allegiance of the shipowner. *Kukias,* 839 F.2d at 862. In determining the allegiance of a corporation, a court must look through the "facade of incorporation" to find the true ownership of the vessel or its operator. *Id.*

grounds, *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 (5th Cir.1987) (en banc). Thus, although the TAHARA was involved in exploration, and may have drilled or

The shipowner Hitech is an Indian corporation conducting all of its business in and around India. Although 36% of Hitech is owned by Sedco Drilling, a Schlumberger subsidiary organized under the laws of Panama, there is no evidence that Hitech is "a foreign shell created by American interests to avoid the requirements of American law." *Kukias,* 839 F.2d at 862. Accordingly, the Court finds that Hitech has no allegiance to the United States.

■ Sedco, although a British Virgin Islands corporation, clearly has some connection to the United States. Sedco provides benefit plans that are administered in the United States, and until July 1988 had support services provided by Schlumberger Technology, a Schlumberger subsidiary located in Texas. Moreover, although Sedco has no officers or directors in common with its parent corporations Sedco International and Schlumberger, Schlumberger has many connections with the United States and Schlumberger appears to exercise some degree of centralized control and administration over its Sedco Forex subsidiaries, including Sedco. *Cf. Kukias,* 839 F.2d at 861, 862 (allegiance of corporations determined by domiciliaries of parent corporations). Finally, Sedco recruited the plaintiffs from Schlumberger Technology, a Schlumberger subsidiary located in Texas, after Schlumberger Technology had bought out the plaintiffs' former employer, Sedco Inc., an independent Texas corporation. Based upon these practical connections to the United States, Sedco may fairly be said to have *some* allegiance to the United States.

### 5) *Place of Contract*

Generally given little weight in traditional maritime cases, the place of contract may assume greater importance in the drilling rig context. *Fogleman,* 920 F.2d at 283; *Zipfel,* 832 F.2d at 1482. In addition, a choice of law expressed in an employment contract assumes great significance. *Kukias,* 839 F.2d at 862. Here, Sedco signed the relevant

planned to drill in several different spots on the Indian continental shelf, it is still appropriately considered a "drilling rig."

employment contracts in London, England, but it is not clear where the plaintiffs signed them. There is no evidence, however, that plaintiffs signed their contracts in the United States. The plaintiffs' employment contracts also do not contain choice of law provisions. Accordingly, the place of contract has little import in this case and points, if anywhere, to England.

### 6) *Inaccessibility of Foreign Forum*

The factor known as "inaccessibility" of the foreign forum is usually of minor significance. It is based on the practical availability of the foreign forum, *see Lauritzen*, 345 U.S. at 589–90, 73 S.Ct. at 931–32 (considering expense and loss of time to New York resident of traveling to Europe to sue in Danish Court), rather than upon the availability of a legal remedy in the foreign forum. *Fogleman*, 920 F.2d at 284 ("[t]he fact that the law of another forum may be more or less favorable to a plaintiff ... does not determine choice of law") (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 [1981]).[9] A United States forum is clearly the most convenient for McGourty since he resides in Massachusetts, but a South African, English, or Scottish forum would appear to be more practically accessible to the foreign seamen, who reside in or are citizens of those countries.

### 7) *Law of the Forum*

The law of the forum "counts for little when the defendants are 'involuntarily made a party.'" *Kukias*, 839 F.2d at 863. Here, Sedco has consented to personal jurisdiction in the District of Massachusetts in accordance with a stipulation that Schlumberger and Sedco International be dropped as defendants, but Sedco is clearly an involuntary defendant in United States courts. Thus, the law of the forum has little if any import here.

### 8) *Base of Operations of Shipowner*

 The base of operations inquiry generally focuses on the actual day to day operations of the shipowner and the degree of substantial and continuing operational contacts with the United States. *See Rhoditis*, 398 U.S. at 310, 90 S.Ct. at 1734–35; *Kukias*, 839 F.2d at 863–865; *Fogleman*, 920 F.2d at 284. In the drilling rig context particularly, it is the base from which the vessel or relevant business venture is operated on a day to day basis rather than the base of operations of the corporate or ultimate owner of the rig which is important for choice of law purposes. *Fogleman*, 920 F.2d at 284; *Zipfel*, 832 F.2d at 1482; *Phillips*, 632 F.2d at 88; *Das Chagas v. Sedco, Inc.*, 557 F.Supp. 442, 444–445 (E.D.Pa.1983). This analysis is applicable even when the plaintiff is an employee of an entity other than the shipowner, *Fogleman*, 920 F.2d at 281, 284, and even when the day to day operations constitute implementation of policy or decisions made by a parent company in the United States. *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015, 1019 (5th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982), *overruled on other grounds, In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147 (5th Cir.1987) (en banc); *Phillips*, 632 F.2d at 88.

 Here, "the overall management of the rig, including when and where [in the Indian continental shelf region] the TAHARA was to conduct its operations, remained with Hitech." (Stip. Facts ¶ 27.)

**9.** In *Kukias*, the First Circuit found Greece an accessible forum apparently by reference to the district court's requirements that the defendants waive jurisdiction, venue, and statute of limitations defenses in the Greek courts. *See* 839 F.2d at 861, 863. With respect, this Court views these references by the *Kukias* court to have been the painting on the lily, cf. *United States v. Savoie*, 985 F.2d 612, 616 (1st Cir.1993); *United States v. DeJesus*, 984 F.2d 21, 25 (1st Cir.1993); *Lipsett v. Blanco*, 975 F.2d 934, 941 (1st Cir.1992) (and more than sixty other First Circuit cases employing this phrase), and does not interpret the First Circuit to have superimposed a legal availability analysis upon *Lauritzen*'s accessibility factor. Accordingly, this Court, like other courts, treats legal availability as relevant only to the *forum non conveniens* analysis. *See Fogleman*, 920 F.2d at 283 & n. 14, 284 ("[a]s the Supreme Court noted in *Lauritzen*, [the inaccessibility of a foreign forum] is only relevant to a forum non conveniens determination, not to a choice-of-law analysis"); *Zipfel*, 832 F.2d at 1482–84 (not even mentioning the accessibility factor in its choice-of-law analysis, but going into legal availability in depth in its *forum non conveniens* analysis); *Neely v. Club Med Sales, Inc.*, 1992 WL 398378 *3 (E.D.Pa.1992).

Thus, although plaintiffs were "under the direct supervision of [Sedco] personnel with respect to day to day [technical] operations on the TAHARA," (*id.*), Hitech's control over the venture as a whole determines the base of operations. As previously discussed, Hitech is an Indian corporation with all its offices and operations in India, and with no operational connection in the United States. Moreover, although Hitech is partially (36%) owned by Sedco Drilling, a Panamanian Schlumberger subsidiary, there is no evidence that Hitech was controlled by foreign entities, or that it was "was ... formed ... to evade obligations of [Schlumberger or its subsidiaries] under American law." *See Fogleman*, 920 F.2d at 284; *Kukias*, 839 F.2d at 864–65. Accordingly, the Court finds that the TAHARA's base of operations was India.

### 9) *Additional Considerations*

 Finally, the Court addresses an additional policy argument presented by the plaintiffs. *See Rhoditis*, 398 U.S. at 309, 90 S.Ct. at 1734 (the enumerated factors are "not intended as exhaustive"). The plaintiffs argue that the United States' strong interest in controlling the potential spread of disease, particularly AIDS, counsels in favor of application of American law. Without deciding whether this interest provides an appropriate basis for determining choice of law, the Court notes that India surely has a greater interest in resolving this particular dispute. The contaminated vaccine was manufactured and distributed in India, was administered by Indian nationals to other Indian nationals in addition to the plaintiffs, and occurred as part of India's nationwide problem with contamination of all blood products manufactured in India in 1988. Under these circumstances, surely India has a greater interest in addressing the plaintiffs' claims.

To recapitulate—with regard to the foreign seamen's claims, the only factor favoring

application of American law is Sedco's partial allegiance to the United States. On the other hand, the place of the wrong and the base of operations, two of the most important factors in the drilling rig context, point to application of Indian law, while all other factors—the law of the flag, the allegiance of the foreign seamen, the place of contract, and forum inaccessibility—point to various locations around the world: respectively, Liberia, the United Kingdom, possibly England, and perhaps South Africa. Based as it is only on Sedco's partial allegiance to · the United States, this ·Court rules that American law does not apply to the claims of the foreign seamen.[10] *Cf. Zipfel*, 832 F.2d at 1483 (Indonesian or Singapore law applied to foreign seamen's claims because, even though the vessel was registered in the United States and the defendant was a United States corporation, the place of wrong, the base of operations, and the place of contracts was in Indonesia or Singapore). Instead, the Court's analysis of the *Lauritzen–Rhoditis* factors indicates that the claims of the foreign seamen should be addressed under Indian substantive law.[11]

With regard to McGourty's claims, the factors are roughly the same except that McGourty is a United States citizen and resident and the United States provides him a more accessible forum. The Court rules that these additional factors are enough to tip the balance in favor of applying American law to McGourty's claims. *Cf. Zipfel*, 832 F.2d at 1483 (Indonesian or Singapore law applied to foreign plaintiff's claims ... American law applied to American seaman's claims based on the allegiance of the defendant and the law of the flag). The allegiance of a seaman is particularly important in the drilling rig context, *see Zipfel*, 832 F.2d at 1482, and "each nation has a legitimate interest [to protect] its permanent inhabitants." *Laurit-*

---

**10.** Since the Court rules that the Jones Act does not apply to the foreign seamen's claims, the Court need not consider Sedco's alternate argument that the Jones Act precludes recovery for foreign seamen who have a remedy available in their nation of citizenship or residency. *See* 46 U.S.C.App. § 688(b)(2).

**11.** There is also evidence supporting application of South African law (domicile of foreign seamen, most accessible), English law (Marriott and Slowey are citizens, contracts signed by Sedco in England, certain benefits administered there), or Scottish law (Mathieson is citizen), but the Court rules that in the balance, based upon the place of the wrong and the base of operations, Indian law applies.

*zen*, 345 U.S. at 586, 73 S.Ct. at 930. Thus, although courts have in some instances declined to apply American law to United States seamen, they have done so only "when all other [significant] factors indicate the application of [a particular] foreign [forum's] law." *E.g., Fogleman*, 920 F.2d at 284 (place of wrong, law of flag, allegiance of defendant, place of contract, and base of operations pointed to Saudi Arabia); *Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1162 (5th Cir.1987) (law of flag, allegiance of defendant, place of wrong, and base of operations pointed to Saudi Arabia),[12] *reh'g denied*, 824 F.2d 972, *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Here, although the place of wrong and the base of operations factors point to India, McGourty's allegiance and the accessibility factors point to the United States, Sedco has partial allegiance to the United States, and all other factors point to alternate locations. Under these circumstances, the Court rules that American law applies to McGourty's claims.

In sum, the Court rules that McGourty's claims are properly asserted under American law, but Marriott's, Mathieson's, and Slowey's claims are to be addressed under Indian substantive law.

## C. FORUM NON CONVENIENS

■ The Court must now determine whether plaintiffs' claims should be dismissed on the basis of *forum non conveniens*. As to the foreign seamen, "the need to apply foreign law is not in itself reason to apply the doctrine of *forum non conveniens*," *Schexnider*, 817 F.2d at 1163–64 (5th Cir.1987) (case remanded to district court for application of Australian law); *Zipfel*, 832 F.2d at 1483–85, and thus the Court conducts a full *forum non*

*conveniens* analysis with respect to the foreign seamen's claims as if asserted under Indian substantive law. Second, as to McGourty's claims, the circuits are split concerning whether Jones Act suits may ever be dismissed on the basis of *forum non conveniens*. Compare *Zipfel*, 832 F.2d at 1487 (Jones Act suits not subject to *forum non conveniens* analysis) *with In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1163 n. 25 (5th Cir.1987) (*forum non conveniens* applies to Jones Act cases), *vacated on other grounds sub. nom, Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989).[13] Nevertheless, the Court need not decide this issue since, as revealed below, McGourty's claims are not subject to *forum non conveniens* dismissal in any event.

■ The doctrine of *forum non conveniens* permits discretionary dismissal on a "case by case" basis where an alternative forum is available in another nation which is fair to the parties and substantially more convenient for them or the courts. *Mercier v. Sheraton Intern., Inc.*, 981 F.2d 1345, 1349 (1st Cir.1992) (*Mercier II* ), *cert. denied*, —— U.S. ——, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993). There is a strong presumption in favor of the plaintiff's forum choice, however, and thus the defendant bears the burden of proving *both:* (1) the availability of an alternate forum; and (2) the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum. *Id.* (citations omitted); *see also Piper Aircraft v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981).

### 1. *Forum Availability and Adequacy*

■ To establish the existence of a satisfactory alternative forum, a defendant

---

12. In *Schexnider*, the place of contract was actually the United States but, since *Schexnider* was a traditional maritime case, the place of contract was of lesser significance and the contract specifically provided that employment was for the "Southeast Asia Area." 817 F.2d at 1161–62.

13. The Ninth, Tenth and Eleventh Circuits exempt Jones Act claims from the *forum non conveniens* analysis based upon the Supreme Court's treatment of claims brought under the FELA. *Zipfel*, 832 F.2d at 1487 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 505, 67 S.Ct. 839, 841–42, 91 L.Ed. 1055 [1947] ); *Needham v. Phillips Pe-*

*troleum Co. of Norway*, 719 F.2d 1481, 1483 (10th Cir.1983); *Szumlicz v. Norwegian America Lines, Inc.*, 698 F.2d 1192, 1195 (11th Cir.1983). On the other hand, the Second and Fifth Circuits have recently changed their approach and now apply a *forum non conveniens* analysis to Jones Act cases based upon *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). *See In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1163 n. 25; *Gazis v. John S. Latsis, Inc.*, 729 F.Supp. 979, 985–990 (S.D.N.Y.1990).

must show (a) that the defendant is amenable to process in the alternative forum; and (b) that "the remedy provided by the alternative forum is [not] so clearly inadequate or unsatisfactory that it is no remedy at all." *Mercier II*, 981 F.2d at 1350. With regard to the second prong, a foreign forum may be inadequate if it " 'does not permit litigation of the subject matter of the dispute,' " *id.* (quoting *Piper Aircraft*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22), or if the plaintiff demonstrates significant political or legal obstacles to conducting litigation in the alternative forum. *Id.* In this case, the availability and adequacy of alternative forums must also be viewed in light of Sedco's stipulation that, if this Court dismisses plaintiffs' claims on the grounds of *forum non conveniens*, it will agree to: (1) consent to jurisdiction in India, England, Scotland, or South Africa; (2) waive any applicable statute of limitations defenses; (3) submit to discovery to the extent allowed under the Federal Rules of Civil Procedure; and (4) pay any judgments awarded to the plaintiffs in any other jurisdiction. With these stipulations in mind, the Court addresses each of the suggested alternative forums.

### (i) *India*

Sedco submits affidavits from M.L. Bhakta, a senior Indian attorney, stating that the jurisdiction of the Indian courts may by Central Government Notification be extended to India's continental shelf, and that a defendant may properly consent to jurisdiction in the Indian courts. Bhakta thus declares that the Indian courts would be open to hear the plaintiffs' claims. In response, the plaintiffs submit an affidavit from Mr. Justice Yeshwant Vishnu Chandrachud, the former Chief Justice of India, stating that, while Indian courts would have jurisdiction over a lawsuit arising from events occurring within Indian territorial waters (within 12 miles of the coast of India), the jurisdiction of the Indian courts does not extend to the limits of the Indian "economic zone," and thus does not encompass claims arising on the Indian continental shelf. Mr. Chandrachud also claims

that without such jurisdiction, a defendant would be unable to create jurisdiction in the Indian courts merely by consent. Mr. Bhakta does not successfully rebut Mr. Chandrachud's affidavit and thus, based only on these conflicting affidavits, Sedco has failed to establish that an Indian court would assert jurisdiction over the plaintiffs' claims or Sedco, whatever its stipulation.

In addition, Mr. Chandrachud also states that the applicable Indian statute of limitations—which is three years and has thus expired—would *not* be tolled by the claims now asserted by the plaintiffs in this Court, and that, according to the Indian Limitations Act of 1963, the statute of limitations defense cannot be waived by a defendant. In response, Mr. Bhakta states only that "the decisions interpreting whether or not the exclusionary provisions of the [Indian] Limitations Act ... apply to cases initially filed in foreign as opposed to Indian courts go both ways. The matter has not yet been decided." Thus, Sedco has failed to establish that plaintiffs' claims would be timely in an Indian court. Furthermore, Mr. Chandrachud also states that contingent fees are not permitted in India, and that an Indian court would likely require the plaintiffs to provide a security deposit in order to bring suit. Inability to pre-pay a retainer and advanced costs has been considered a factor in the *forum non conveniens* analysis. *See, e.g., Fiorenza v. United States Steel Int'l, Ltd.*, 311 F.Supp. 117, 120–121 (S.D.N.Y.1969).

Finally, Messrs. Bhakta and Chandrachud contest whether Indian law allows litigation of the subject matter of the plaintiffs' dispute.[14] Mr. Bhakta states that although "there is no decided case law on this subject," the Indian courts are becoming more likely to entertain emotional distress claims of this nature, and thus "the potential certainly exists that any suit brought in India on the basis of the present facts ... would result in a grant of relief for the plaintiff." In response, Mr. Chandrachud states that the plaintiffs might be entitled to damages under Indian law, but only if they have suf-

---

**14.** For the purposes of the *forum non conveniens* analysis, the Court assumes, as did the parties, that the suggested alternate forums would apply

their own substantive law to the plaintiffs' claims.

fered a "recognized psychiatric illness." Since the plaintiffs do not allege psychiatric illness here, it is unclear whether an Indian forum may properly be considered to "permit litigation of the subject matter of the dispute."

Accordingly, since Sedco has failed to establish jurisdiction, amenability to process, or that the plaintiffs' claims would not be time-barred in an Indian court, and perhaps because India does not allow litigation of the subject matter of the plaintiffs' dispute, Sedco has failed to show that India is an adequate alternative forum.

### (ii) South Africa

Sedco contends that South Africa provides an adequate alternative forum for the three foreign seamen, who are residents there. Sedco submits affidavits from Mr. Cecil Celbart, a South African attorney, who admits that a South African court ordinarily would not have jurisdiction over Sedco, but suggests an elaborate scheme by which jurisdiction could be engineered by a transfer of property by Sedco into South Africa, and an ensuing attachment of that property by the foreign plaintiff. In response, the plaintiffs submit affidavits from Mr. Dirk Abraham John Uijs, another South African attorney, who provides a thorough review of both statutory and admiralty jurisdiction under South African law, and concludes that under neither body of law would a South African court have jurisdiction over Sedco. Mr. Uijs also provides convincing support for the notion that Sedco would not be able to establish South African jurisdiction merely by consent, including through the scheme suggested by Mr. Gelbart. Accordingly, since Messrs. Uijs and Gelbart appear to have a real dispute as to whether Sedco would be amenable to process in South Africa, Sedco has failed to meet its burden.

In addition, although it appears that statute of limitations defenses may be waived in South Africa, and that South African courts entertain pure emotional distress claims, Mr. Uijs makes it quite clear that South African law would allow the plaintiffs an action only against the doctor who provided the inoculations or against that doctor's actual employer. Thus, Mr. Uijs asserts, and Mr. Gelbart does not dispute, that the plaintiffs would have no valid claim against Sedco in a South African Court.

Accordingly, since Sedco has failed to establish either the amenability to process or the viability of litigation of the subject matter of the plaintiffs' dispute, South Africa cannot properly be considered an adequate alternative forum.

### (iii) England

Sedco contends that England provides an adequate alternative forum for Marriott and Slowey, who are English citizens. As a preliminary matter, both Solicitor Peter Maurice Watson, affiant for Sedco, and John Melville Williams, Q.C., affiant for the plaintiffs, agree that: (i) Sedco may waive the applicable English statute of limitations; (ii) no security deposit is required unless requested by a defendant; and (iii) an English court will apply English law if Sedco raises no objection.

The parties disagree, however, as to whether Sedco is actually amenable to process in the English courts. Both affiants agree that an English court would not ordinarily have jurisdiction over Sedco, but they disagree as to whether Sedco may consent to jurisdiction. Neither affiant cites any statutory or case authority for his position. Sedco carries the burden of proof on this issue. Upon this record, the Court rules that Sedco has failed to establish that Sedco is amenable to process in England.

In addition, it is also unclear whether English law permits litigation of the subject matter of the plaintiffs' dispute. While Mr. Watson cites several cases which indicate that English law provides a remedy for pure emotional distress claims, Mr. Williams cites several recent cases which appear to require proof of actual psychiatric injury (which the plaintiffs do not allege) as a prerequisite to recovery. Thus, the availability of recovery in England for emotional distress in the absence of actual psychiatric injury appears to be an unsettled issue of English law. As such, it is unclear whether England may properly be considered a substantively adequate forum. Finally, Mr. Williams also

claims, without opposition, that England does not allow contingency fee arrangements.

Accordingly, because Sedco has failed to establish amenability to process in England, and perhaps because England does not permit litigation of the subject matter of the plaintiffs' dispute, Sedco has failed to establish that England is an adequate alternative forum.

### (iv) *Scotland*

■ Finally, the defendant contends that Scotland provides an adequate alternative forum for Mathieson, a Scottish citizen. Sedco's affiant James Kevin Tierney, a Scottish attorney, and Mathieson's affiant Colin Neil McEachron, another Scottish attorney, agree: (i) that Sedco can consent to jurisdiction in the Scottish courts; (ii) that Sedco can waive the applicable statute of limitations defense; and (iii) that contingent fee arrangements of some sort are available. The affiants disagree, however, as to whether Scotland permits litigation of the subject matter of the plaintiffs' dispute. As under English law, the affiants debate whether proof of actual psychiatric injury is required for recovery.

Under these circumstances, the Court is inclined to rule that Scotland does not provide Mathieson an adequate forum. Nevertheless, the Court notes that the Supreme Court has cautioned lower federal courts against maintaining jurisdiction simply because a foreign forum does not recognize an identical cause of action. *Piper Aircraft,* 454 U.S. at 254–55, 102 S.Ct. at 265–66; *Mercier v. Sheraton Intern., Inc.,* 935 F.2d 419, 425 n. 7 (1st Cir.1991) (*Mercier I*). Accordingly, despite its inclination to find a Scottish forum inadequate, the Court nonetheless engages in the second stage of the *forum non conveniens* analysis with respect to Mathieson's claims in a Scottish forum.[15]

*In sum,* Sedco has failed to establish that India, South Africa, or England is an adequate alternative forum. Accordingly, Sedco's motion for summary judgment on the basis of *forum non conveniens* is denied with respect to the claims of McGourty, Marriott, and Slowey. With respect to Mathieson's claims, however, there is some question as to whether Scotland provides an adequate alternative forum, and thus the Court addresses the private and public interest factors with respect to Scotland.

### 2. *Private and Public Interest Factors*

■ If an adequate alternative forum is found to exist, a court must then determine whether the alternative forum is sufficiently more convenient for the parties as to make transfer necessary to avoid serious unfairness. *Mercier II,* 981 F.2d at 1354. The Supreme Court has identified both private and public interest criteria to be employed in this inquiry. The 'private interest' criteria include:

> (1) the relative ease of the parties' access to sources of proof; (2) the availability of compulsory process and the cost of obtaining attendance of witnesses; (3) the possibility of a view of the premises, if a view would be appropriate; (4) and an evaluation of 'all other practical problems that make trial of a case easy, expeditious and inexpensive.'

*Mercier II,* 981 F.2d at 1354 (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 [1947]).

The public interest criteria include:

> (1) the administrative difficulties resulting from court congestion in the plaintiff's chosen forum; (2) the 'local interest in having localized controversies decided at home'; (3) the interest in having the trial of a case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in application of foreign laws; and (5) the unfairness of imposing jury duty on citizens in an unrelated forum.

*Mercier II,* 981 F.2d at 1354 (quoting *Piper Aircraft,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6).

The plaintiff's choice of forum "should rarely be disturbed," *Gulf Oil,* 330 U.S. at

---

**15.** As revealed below, the private and public factors favor this forum over a Scottish forum in any event, and thus this Court need not conclusively decide whether Scottish law provides litigation of the subject matter of the plaintiffs' dispute.

508, 67 S.Ct. at 843, and thus a defendant carries a heavy burden to show that private and public interests weigh in favor of trial in the foreign forum. *Mercier II*, 981 F.2d at 1354.

Applying the private interest factors, a Scottish court has no greater access to witnesses, sources of proof, or other evidence. Moreover, since Marriott's, Slowey's, and McGourty's claims are to be resolved in this forum, this Court provides the most efficient forum for resolution of Mathieson's claims as well. Thus, the private interest factors favor this forum.

As to the public interest factors, Scotland clearly has no greater localized interest in this case, and the burden upon the Scottish courts of entertaining Mathieson's action anew is greater than the burden upon this Court of accepting Mathieson as an additional plaintiff in the ongoing actions of the other three seamen. Moreover, although the parties have not addressed whether a Scottish court would apply Indian or Scottish law to Mathieson's claims, and thus it is not clear whether a Scottish court would be burdened with applying foreign law, the application of Indian law to Mathieson's claims provides no additional burden upon this Court since it is already applying Indian law to Marriott's and Slowey's claims. Accordingly, the public interest criteria weigh in favor of this forum as well.

Therefore, because both the private and public interest factors weigh in favor of this forum, Sedco's motion to dismiss Mathieson's claims on the basis of *forum non conveniens* is denied.

16. Sedco has understandably presented no argument with respect to obtaining summary judgment on the foreign seamen's claims under Indian substantive law, and thus the Court makes no comment upon the merits of those claims.

17. While the actual vaccine with which McGourty was inoculated was not tested for presence of the HIV (since its contents were injected into his body), the Court views the HIV-positive test on the remaining fifty-fifth vial to be sufficient proof that all vials within the batch may have been contaminated.

18. The parties stipulated that McGourty suffered "severe emotional distress." (Stip. Facts ¶ 37.)

## D. AMERICAN SEAMAN'S EMOTIONAL DISTRESS CLAIMS[16]

McGourty seeks recovery for the emotional injury he sustained as a result of his fear of having contracted the HIV, after finding that he had been inoculated with a vaccine testing positive for the presence of HIV anti-bodies.[17] McGourty offers no objective physical manifestations of his fear, but rests upon a stipulation that he has suffered purely psychic and emotional injury.[18] Sedco has moved for summary judgment on the basis that neither the Jones Act nor the general maritime law allows recovery for emotional distress without attendant physical injury.[19]

As a preliminary matter, the Supreme Court has mandated uniformity between the Jones Act and the general maritime law, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 20, 111 S.Ct. 317, 318, 112 L.Ed.2d 275 (1990) ("the Jones Act establishes a uniform system of seamen's tort law"), and thus the Court need only conduct one inquiry to determine whether McGourty evidences compensable damage under the Jones Act and the general maritime law. In conducting the inquiry, however, the court considers not only maritime cases, but also cases decided under the Federal Employer's Liability Act (FELA). The Jones Act incorporates the FELA by reference, 46 U.S.C.App. § 688(a), and extends to seamen the same remedies and liability standards afforded to railroad workers under the FELA. *Ferguson v. Moore–McCormack Lines*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957) ("the standard of liability under the Jones Act is

Since on a summary judgment motion the plaintiff is required to set forth specific facts, in suitable evidentiary form, which establish a right to relief, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986), the Court cannot interpret this stipulation to encompass more than what it says—that McGourty suffered purely *"emotional"* injury.

19. Sedco challenges McGourty's emotional distress claims only with respect to whether McGourty has shown compensable damage, and thus this Court passes no judgment upon the factual sufficiency of other aspects and elements of McGourty's emotional distress claims.

[the same as] that established by Congress under the [FELA]").

As a starting point, the Court derives guidance from the seminal case of *Atchison, Topeka and Santa Fe Railway Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), in which the Supreme Court indicated that under the FELA an individual may under certain circumstances recover for wholly emotional injury:

> Assuming, as we have, that FELA [and Jones Act] jurisprudence gleans guidance from common law developments, whether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity.... In short, the question whether one can recover for emotional injury may not be susceptible to an all-inclusive 'yes' or 'no' answer. As in other areas of law, broad pronouncements in this area may have to bow to precise application of developing legal principles to the particular facts at hand.

*Id.* at 568, 570, 107 S.Ct. at 1417, 1418 (the Court ruled that the record before it provided an insufficient basis from which to make such a determination); *see Moody v. Maine Central R.R. Co.,* 823 F.2d 693, 694 (1st Cir.1987) ("[w]e discern from the *Buell* opinion an attempt to leave the door to recovery for wholly emotional injury somewhat ajar but not by any means wide open").

Subsequent to *Buell,* several courts have allowed recovery for wholly emotional injury, *e.g., Taylor v. Burlington Northern R.R. Co.,* 787 F.2d 1309, 1313 (9th Cir.1986); *Carroll v. Consolidated Rail Corp.,* 1991 WL 32859 (E.D.Pa.1991), *aff'd,* 941 F.2d 1200 (3d Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 916, 116 L.Ed.2d 816 (1992), while other courts have rejected specific claims but have reiterated that the FELA allows recovery for wholly emotional injury under certain circumstances. *E.g., Holliday v. Consolidated Rail Corp.,* 914 F.2d 421, 426–27 (3d Cir. 1990), *cert. denied,* 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1057 (1991); *Gaston v. Flowers Transp.,* 866 F.2d 816, 821 (5th Cir. 1989).[20] At least one court, however, has held that the FELA does not allow recovery for wholly emotional injury unless the emotional injury results from physical contact or the threat of physical contact. *Ray v. Consolidated Rail Corp.,* 938 F.2d 704, 705 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 914, 116 L.Ed.2d 813 (1992). To some extent, the differing outcome of these cases is understandable due to the fact specific nature of the inquiry. *See Buell,* 480 U.S. at 568, 107 S.Ct. at 1417.

To date, no court in the First Circuit has squarely addressed application of *Buell* to a claim for wholly emotional injury.[21] Consistent with *Buell,* however, the First Circuit has indicated that to determine whether wholly emotional injuries are recoverable, a court must engage in "a careful analysis of the specific facts of the case at hand," as well as "a review of common law jurisprudence and policy considerations." *Ellenwood v. Exxon Shipping Co.,* 984 F.2d 1270, 1282 (1st Cir.1993), *cert. denied,* — U.S. —, 113 S.Ct. 2987, 125 L.Ed.2d 682 (1993); *see also Moody,* 823 F.2d at 694. Thus, this Court reviews McGourty's emotional distress claims in light of common law jurisprudence and in view of the specific facts underlying his claims.

McGourty presents a particularly compelling case for recovery of wholly emotional injury, and one remarkably similar to a claim recently addressed and permitted by the Dis-

---

**20.** In *Plaisance v. Texaco, Inc.,* 937 F.2d 1004, 1009 (5th Cir.1991), a divided panel of the Fifth Circuit announced a broad rule permitting recovery for negligently caused emotional injury, but denied recovery in the instant case because the accident was so unexceptional that the significant emotional injury sustained by the tugboat captain was not reasonably foreseeable. Subsequently, in an en banc ruling, the Fifth Circuit affirmed the denial of recovery but withdrew the *Plaisance* court's broad ruling of law, returning the Fifth circuit to the open-ended position announced in *Gaston.* 966 F.2d 166 (1992), *cert. denied,* — U.S. —, 113 S.Ct. 604, 121 L.Ed.2d 540 (1992).

**21.** *Buell* has nonetheless affected jurisprudence in this Circuit. *See, e.g., Teague v. National R.R. Passenger Corp.,* 708 F.Supp. 1344, 1350 (D.Mass.1989) (holding that, after *Buell,* neither presence within the "zone of danger" nor actual or threatened impact are necessary to a negligent infliction claim under the FELA).

trict Court for the Eastern District of New York. *See Marchica v. Long Island R.R.,* 810 F.Supp. 445 (E.D.N.Y.1993). In *Marchica,* a railroad worker had pricked his finger upon a discarded hypodermic needle while cleaning out debris from a railroad car, and sought to recover from his employer for "post-traumatic stress and accompanying psychological difficulties" allegedly suffered due to his fear of contracting AIDS. *Id.* at 446, 449–50. After conducting a thorough review of the relevant case law, the *Marchica* court concluded that the FELA encompasses a cause of action for fear of contracting AIDS where the basis of the claim is a documented physical injury (i.e., an accidental needle prick), and thus denied the employer's motion for summary judgment even though the offending hypodermic needle was never actually tested for the presence of HIV, and the plaintiff had tested HIV-negative. *See id.* at 446–47, 449–53. Here, McGourty appears to present an even stronger case for recovery since he has established actual exposure to an HIV-positive vaccine.

To date, *Marchica* appears to be the only FELA or Jones Act case to have addressed a claim to recover for the fear of contracting AIDS. Nonetheless, this Court derives additional guidance from the numerous state law cases which have recently addressed similar emotional distress claims. *See Buell,* 480 U.S. at 568, 107 S.Ct. at 1417 ("FELA [and thus Jones Act] jurisprudence gleans guidance from common law developments").

State law cases have treated "AIDS phobia" cases somewhat inconsistently. A first group of cases has denied recovery entirely where the plaintiff has failed to demonstrate either an explicit channel of exposure to the HIV, or demonstrable injury in the form of an HIV-positive test. *E.g., Burk v. Sage Products, Inc.,* 747 F.Supp. 285, 287 (E.D.Pa. 1990) (summary judgment granted where paramedic pricked with discarded needle could not demonstrate that needle had been used by an AIDS patient and paramedic had tested HIV-negative); *Funeral Services by Gregory, Inc. v. Bluefield Community Hosp.,* 186 W.Va. 424, 413 S.E.2d 79 (1991) (no recovery for mortician who embalmed an AIDS-infected corpse where he had worn proper protective gear and had not alleged any avenue of exposure); *Hare v. State,* 173 A.D.2d 523, 570 N.Y.S.2d 125 (2d Dept.1991) (recovery denied for hospital employee bitten by unrestrained inmate because employee failed to prove either that inmate was infected or that employee had tested HIV-positive), *appeal denied,* 78 N.Y.2d 859, 575 N.Y.S.2d 455, 580 N.E.2d 1058 (1991); *Doe v. Doe,* 136 Misc.2d 1015, 519 N.Y.S.2d 595 (Sup.1987) (recovery denied to wife based upon husband's homosexual affair because wife failed to allege that husband was infected with AIDS or that she had contracted it). *Compare Johnson v. W. Va. University Hospitals, Inc.,* 186 W.Va. 648, 413 S.E.2d 889 (1991) (allowing claim by police officer bitten by AIDS infected patient who had previously bitten himself and drawn blood).

Other courts have taken a different approach, and have held that where a plaintiff can allege a specific incident of *potential* exposure sufficient to create a reasonable fear of having contracted the AIDS virus, recovery may be had even in the absence of a proven channel of exposure and even in the absence of an HIV-positive test. *E.g., Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327 (Ct. App.Md.1993) (patients operated on by AIDS infected doctor stated claim even though they identified no actual mode of transmission); *Carroll v. Sisters of St. Francis Health Services, Inc.,* 1992 WL 276717 (Tenn.App. Oct. 12, 1992) (woman pricked by discarded syringe left on washbasin in hospital could recover even though no evidence that syringe used by AIDS patient); *Castro v. New York Life Ins. Co.,* 153 Misc.2d 1, 588 N.Y.S.2d 695 (Sup.Ct.1991) (cleaning worker who was stuck with a used hypodermic needle while transferring garbage had viable cause of action even though previous user unknown); *see also Poole v. Alpha Therapeutic Corp.,* 698 F.Supp. 1367 (N.D.Ill.1988) (wife of hemophiliac, who contracted AIDS from defendant's antihemophilic factor, alleged facts sufficient to place her in zone of danger). Here, McGourty establishes a viable claim under either set of cases since he has exhibited a direct channel of exposure to an HIV-positive vaccine.

Courts also differ with respect to whether the plaintiff's emotional distress must be objectively manifested in the form of physical injury or illness. At least one court has dismissed an otherwise viable claim because the plaintiff "failed to allege a physical injury or illness resulting from emotional distress," *Poole*, 698 F.Supp. at 1372, while several other courts appear to have required proof of objective physical manifestations as an element of recovery. *E.g., Faya*, 620 A.2d at 338–39 (relying on presence of physical manifestations such as headaches and sleeplessness); *Johnson*, 413 S.E.2d at 894 ("recovery ... is limited to the situation where ... emotional distress, along with physical manifestations of such distress, result[s] therefrom").

Other courts have allowed "AIDS phobia" claims even in the absence of physical manifestations where the plaintiffs' fears have arisen from a particular incident or occurrence which substantiates the genuineness of the plaintiff's fear:

> If a claim can be tied to a distinct event which could cause a reasonable person to develop a fear of contracting a disease like AIDS, there is a guarantee of genuineness of the claim.

*Castro*, 588 N.Y.S.2d at 696–97 (cleaning worker pricked by discarded needle stated viable claim based upon anxiety disorders and multiple neurotic symptomology); *Carroll*, 1992 WL 276717 (woman pricked by discarded syringe could recover—no mention of physical manifestations); *see also Ordway v. County of Suffolk*, 154 Misc.2d 269, 583 N.Y.S.2d 1014 (Sup.Ct.1992) ("AIDS phobia" may constitute viable psychic injury for purposes of action based on negligent infliction of emotional distress, but surgeon's claim as asserted alleged no specific incident of exposure); *Marchica*, 810 F.Supp. at 453 (whether railroad worker pricked by needle could recover for subsequent "psychological histo-

ry" was question for jury). These cases are supported by analogous cases within the AIDS arena, *see, e.g., M.M.H. v. United States*, 966 F.2d 285, 286, 291 (7th Cir.1992) (suggesting that mistakenly informing someone that they are infected with the HIV might be sufficiently likely to cause emotional distress that the physical injury requirement should not apply—"[t]he plaintiff was falsely diagnosed with a fatal disease [that] is shrouded in mystery and stigma. We have little doubt that she suffered real emotional distress"), by analogous inoculation cases outside the AIDS arena, *see, e.g., Plummer v. United States*, 580 F.2d 72, 76 (3d Cir. 1978) ("the 'impact' of [dormant] tubercle bacilli which infected the bodies of the plaintiffs constitute[d] a sufficient physical nexus" to warrant recovery for emotional distress even without physical symptoms), as well as by courts generally interpreting *Buell* under the Jones Act and the FELA. *See, e.g., Gaston*, 866 F.2d at 821 ("[recovery might] be had under the FELA/Jones Act for a purely emotional injury resulting from actions directed against the plaintiff or an occurrence that happened to him").[22] Here, McGourty's claim falls easily within the ambit of those cases allowing recovery in the absence of physical manifestations, since he has exhibited a single traumatic occurrence in which he was directly exposed to an HIV-positive vaccine.

In sum, based on an analysis of common law jurisprudence and the specific facts of this case, the Court rules that McGourty has exhibited compensable emotional damage under the Jones Act and the general maritime law for his fear of contracting AIDS. McGourty was directly exposed to vaccine testing positive for HIV antibodies, and thus his claims fall easily within the rubric of even those cases requiring a direct channel of exposure. Moreover, due to the clear-cut

---

**22.** Sedco contends that this Court's opinion in *Teague v. National R.R. Passenger Corp.*, 708 F.Supp. 1344, 1350 (D.Mass.1989), precludes recovery under the FELA and the Jones Act for emotional distress without "some [attendant] physical injury, illness, or other objective physical manifestation." *See* 708 F.Supp. at 1347, 1350 (referring to Massachusetts tort elements). Sedco reads too much into *Teague*. In *Teague*,

the presence of ulcers and duodenitis brought the case "easily within the boundaries of the tort as defined by the majority common law rule," *id.* at 1347, and thus this Court had no cause to address whether there might be exceptions to the objective manifestations requirement. Accordingly, *Teague* provides no affirmative barrier to McGourty's claims. Other cases cited by Sedco are likewise inapplicable.

**76**

and egregious manner of McGourty's exposure, it seems beyond peradventure that McGourty reasonably suffered genuine emotional distress. It is for a jury to decide the actual extent of this damage. Accordingly, the Court rules that McGourty evidences sufficient compensable harm to warrant a jury trial, and thus denies Sedco's motion for summary judgment on McGourty's Jones Act and unseaworthiness claims.

## III. CONCLUSION

Sedco's motion for summary judgment is granted in part and denied in part. With respect to the claims of Marriott, Slowey, and Mathieson, Sedco's motion for summary judgment is allowed to the extent of declaring that the law of India, rather than the law of the United States, applies to those plaintiffs' claims. The Court will nonetheless hear the claims of Marriott, Slowey, and Mathieson under Indian substantive law, however, since the Court has denied Sedco's motion for summary judgment on the basis of *forum non conveniens* in its entirety. The Court grants Marriott, Mathieson, and Slowey thirty (30) days within which to amend their complaint to appropriately state the claims available to them under Indian law. Finally, with respect to McGourty's claims, Sedco's motion for summary judgment is denied in its entirety.